[No. 8566. *En Banc.* February 21, 1910.]

## The City of Tacoma, *Respondent*, v. Nisqually Power Company, *Appellant*.[1]

Eminent Domain—Private Use—Statutes—Partial Validity. Under Rem. & Bal. Code, § 8005, authorizing cities to condemn property for lighting, heating, and power purposes "public and private" the word "private" will be eliminated as a nullity, as it is not so commingled with the public uses that they cannot be separated, and the remainder of the act is constitutional as a complete act capable of execution in accordance with the legislative intent (Rudkin, C. J., Fullerton, Gose, and Dunbar, JJ., dissenting).

Eminent Domain—Public and Private Purposes—Pleading— Test. While a city cannot condemn property where the use is for commingled public and private purposes, an allegation in the city's petition that it has, since 1893, been furnishing facilities for lighting, heating and power purposes "public and private," will not defeat the proceeding; since the test is the ultimate purpose now sought, and not what was done in the past.

Eminent Domain — Public Necessity — Power Required — Expected Increase—Evidence—Sufficiency. The evidence sufficiently shows that there is a necessity for the acquisition of 20,000 horse power for public lighting purposes, where the city now uses 9,000 horse power under contract with a power company, that in the past three years the increase has been from 3,400 to 9,000 horse power and from 5,228 lighting meters to 11,258, with an increase of one hundred miles of wire in the last six months, and that at the same ratio, the increase in the next ten years would require 20,000 to 25,000 horse power.

Eminent Domain—Public Use — Lighting — Peak Load — Incidental Private Use. Since a municipal power plant for electric lighting must provide for the peak load, or maximum power required on the shortest day of the year, the sale by the city of current for heating and cooking devices and running small machines such as lathes, etc., in the meantime, is so insignificant and incidental to the main public use as not to defeat the right to condemn property for the maximum public use required.

Same—Property Devoted to Public Use—Legislative Powers. The more extended and beneficial public use employed by a municipal corporation amounts to a reasonable necessity for and authorizes the taking of the property of a public service corporation already

[1]Reported in 107 Pac. 199.

devoted to the same public use, under Const., art. 12, § 10, declaring that the exercise of the right of eminent domain shall not be abridged to prevent the legislature from taking the property and franchises of incorporated companies; the legislature being exclusively vested with the right to determine under what circumstances, and to what extent, the power may be exercised.

SAME—STATUTES. Rem. & Bal. Code, § 8005, authorizing cities to condemn for public purposes "works, plants, and facilities," either expressly or by necessary implication grants the right to acquire works and plants of private corporations already devoted to a public use.

EMINENT DOMAIN—VALUES—PROPERTY DEVOTED TO PUBLIC USE—EVIDENCE—ADMISSIBILITY. In condemnation proceedings by a municipal corporation of the property of a public service corporation, it is not error to exclude evidence showing that the defendant was a public service corporation, where the court was extremely liberal in allowing the value of the land to be shown, and witnesses were permitted to fix great values based upon every possible use and adaptability of the property.

EMINENT DOMAIN—APPEAL—HARMLESS ERROR—INSTRUCTIONS. It being immaterial that defendant, in condemnation proceedings, was a public service corporation, it is not reversible error to instruct that it was not.

SAME—INSTRUCTIONS AS TO VALUES. In condemnation proceedings, error in instructing the jury that they should fix the values from their observations of the property assisted by the testimony, is harmless where other instructions gave the jury proper rules for determining the values, and stated that their view of the premises was to enable them to better understand the testimony.

EMINENT DOMAIN — PROCEEDINGS — DAMAGES—VALUES—PROSPECTIVE PROFITS. In condemnation proceedings, evidence of the possible profits of a business that might be carried on on the property taken is inadmissible for the purpose of showing the value of the property.

Appeal from a judgment of the superior court for Pierce county, Easterday, J., entered September 14, 1909, upon findings in favor of the plaintiff and the verdict of the jury awarding damages, after a trial on the merits, in condemnation proceedings. Affirmed.[1]

*Hayden & Langhorne*, for appellant, contended, among other things, that the power to condemn property already

[1]NOTE: See, also, 54 Wash. 292, 103 Pac. 49.—REP.

held for, or devoted to, public use must be granted by express terms or by necessary implication. *Suburban Rapid-Transit Co. v. Mayor of New York*, 128 N. Y. 510, 28 N. E. 525; *Starr Burying Ground Ass'n v. North Lane Cemetery Ass'n*, 77 Conn. 83, 58 Atl. 467; *Bishop v. People*, 200 Ill. 33, 65 N. E. 421; *New Haven Water Co. v. Borough of Wallingford*, 72 Conn. 293, 44 Atl. 235; *Baltimore & Ohio & C. R. Co. v. North*, 103 Ind. 486, 3 N. E. 144; *City of Terre Haute v. Evansville etc. R. Co.*, 149 Ind. 174, 46 N. E. 77, 37 L. R. A. 189; Lewis, Eminent Domain (2d ed.), § 269; *Seattle & M. R. Co. v. State*, 7 Wash. 150, 34 Pac. 551, 38 Am. St. 866, 22 L. R. A. 217; *Seattle & M. R. Co. v. Bellingham Bay & E. R. Co.*, 29 Wash. 491, 69 Pac. 1107, 92 Am. St. 907; *Samish River Boom Co. v. Union Boom Co.*, 32 Wash. 586, 73 Pac. 670. There is no statute in this state, which, in express terms or by necessary implication, grants the city the right to condemn property devoted to public use. *Seattle & M. R. Co. v. State, supra; Matter of City of Buffalo*, 68 N. Y. 167; *Suburban Rapid-Transit Co. v. Mayor of New York, supra*. Condemnation statutes being in derogation of the common right, are not to be extended by implication, but must be strictly pursued. *Seattle v. Fidelity Trust Co.*, 22 Wash. 154, 60 Pac. 133. The rule of "first in time is first in right" applies. *State ex rel. Cascade Public Service Corp. v. Superior Court*, 53 Wash. 321, 101 Pac. 1094; *State ex rel. Kettle Falls Power & Irr. Co. v. Superior Court*, 46 Wash. 500, 90 Pac. 650; *Nicomen Boom Co. v. North Shore Boom Co.*, 40 Wash. 315, 82 Pac. 412. It is immaterial that the plant of the defendant is not already constructed. *State ex rel. Harlan v. Centralia-Chehalis Elec. R. & P. Co.*, 42 Wash. 632, 85 Pac. 344, 7 L. R. A. (N. S.) 198; *State ex rel. Spokane Falls & N. R. Co. v. Superior Court*, 40 Wash. 389, 82 Pac. 417; *Nicomen Boom Co. v. North Shore Boom Co., supra; Suburban Rapid-Transit Co. v. Mayor of New York, supra*. The act of 1909 is unconstitutional as providing for the taking of private property

for private purposes. *Attorney General v. Eau Claire*, 37 Wis. 400; *Curtis v. Whipple*, 24 Wis. 350, 1 Am. Rep. 187; *Whiting v. Sheboygan & F. R. Co.*, 25 Wis. 167, 3 Am. Rep. 30; *City of Paterson v. Society etc.*, 24 N. J. L. 385; *Berrien Springs Water Power Co. v. Berrien Circuit Judge*, 133 Mich. 48, 94 N. W. 379, 103 Am. St. 438; Lewis, Eminent Domain (3d ed.), § 315.

*T. L. Stiles, Frank R. Baker*, and *F. A. Latcham*, for respondent.

MORRIS, J.—This is a proceeding instituted by the city of Tacoma to condemn and appropriate certain lands and water rights lying along the Nisqually river, for the purpose of generating electric power for the city. The appellant, being an owner of certain lands sought by the city for this purpose, resisted the attempt and, from a judgment of appropriation in which it is awarded $50,000 as the value of its lands, it appeals.

Exceptions were taken by appellant to the order of the court holding the contemplated use by the city to be a public use and necessity; and various objections raised by appellant at the trial, all involving the same questions, are before us. We will not attempt to discuss them separately, except in so far as it is necessary.

It is first contended that the public utilities act of 1905 (Laws 1905, p. 300, ch. 159), as amended in 1909, under which the city is proceeding, is unconstitutional for the reason that it authorizes condemnation for both public and private use. The language of the act, in so far as this question is involved, is:

"That any incorporated city . . . is authorized to construct, condemn and purchase, purchase, acquire, add to, maintain and operate works, plants and facilities for the purpose of furnishing such city or town and the inhabitants thereof, and other persons, with gas, electricity and other means of power and facilities for lighting, heating, fuel and

power purposes, public and private." Laws 1909, p. 580, ch. 150 (Rem. & Bal. Code, § 8005 *et seq.*). ·

It may be accepted as well established that, inasmuch as private property may not be taken for private use, any legislative act which attempted to confer such a power would be a nullity. It may also be accepted that where, in a legislative act, there is a conferring of authority to take private property for both public and private use in such a way that the two cannot be separated, the whole act is void. But it does not follow that the use of the word "private" in the act under consideration renders this act void. In so far as such act would authorize the taking for a distinctively private purpose, it could not be upheld; but to render the whole act void it must appear that the public and private purposes are so commingled that they cannot be separated, as in the case cited by Lewis on Eminent Domain, § 206, where the act authorized the erection of a dam by a city, either for the purpose of water works for the city or for the purpose of leasing the water for private use. The purpose of the dam was manifestly two-fold, to supply the city with water for the use of its inhabitants—a public use—and to enable it to lease water for a private use. It could not be determined how much water would be desired or be necessary for one purpose, nor how much for the other, or which use was the greater. The two uses were principal uses, and were so intermingled that they could not be separated without destroying the purpose for which the dam was to be erected; and hence the whole act was void.

But in the act before us, every mentioned and described purpose is an undoubted public use. There is no commingling of public and private purposes, nor authority given under the act to use any of the facilities therein referred to for other than a distinctively municipal use. Unfortunately the word "private" is incorporated in the act, and as such a purpose is a prohibited one, to that extent the act is obnoxious to the constitutional inhibition,

and the word "private" becomes a nullity. The withdrawal of the void part does not disturb nor affect the remainder of the act, the provisions of which are useful and necessary to the growing municipalities of this state in order to supply their inhabitants with needful public utilities, and it would be inconsistent with all just principles of constitutional law to hold the enactment of such purposes void because they are associated with, but not connected with nor dependent on, another provision which is bad and which, when stricken from the act, leaves the remainder complete and capable of being executed in accordance with the legislative intent.

It is next asserted by appellant that the city is seeking in this proceeding to condemn for both public and private use, and hence the whole proceeding should fall. This contention is based upon a paragraph of the petition in which it is alleged:

"That at all times since the year 1893 the city of Tacoma has been engaged in the business of owning, operating and maintaining works, plants and facilities for the purpose of furnishing said city and the inhabitants thereof with electricity and facilities for lighting, heating, fuel and power purposes, public and private."

It is also suggested that the same fact is disclosed in the evidence. None of the ordinances which initiated this proceeding, or are in any wise indicative of the city's purpose in seeking to acquire these lands, indicate or refer to any private use or to any purpose other than a strictly municipal and public one. We have no desire at this time to enter upon any discussion of what is a public use, or the effect upon proceedings of this character where there is an attempt to commingle public and private uses. Such questions have been before this court in a number of cases, and it has been uniformly held that condemnation could not be had where the manifest purpose was partly private. *Healy Lumber Co. v. Morris*, 33 Wash. 490, 74 Pac. 681, 99 Am.

St. 964, 63 L. R. A. 820; *State ex rel. Tacoma Industrial Co. v. White River Power Co.*, 39 Wash. 648, 82 Pac. 150, 2 L. R. A. (N. S.) 842; *State ex rel. Harlan v. Centralia-Chehalis Elec. R. & P. Co.*, 42 Wash. 632, 85 Pac. 344, 7 L. R. A. (N. S.) 198; *State ex rel. Harris v. Superior Court*, 42 Wash. 660, 85 Pac. 666, 5 L. R. A. (N. S.) 672; *State ex rel. Dominick v. Superior Court*, 52 Wash. 196, 100 Pac. 317, 21 L. R. A. (N. S.) 448. The same rule obtains here as announced in the interpretation of the act to determine its constitutionality; that is, the public and private use must be so blended and united that they cannot be separated. It was said in the *Harlan* case, "that where the two [public and private uses] are not so combined as to be inseparable, the good may be separated from the bad"; citing *Lake Koen Nav. etc. Irr. Co. v. Klein*, 63 Kan. 484, 65 Pac. 684; *Brown v. Gerald*, 100 Me. 351, 61 Atl. 785, 109 Am. St. 526, 70 L. R. A. 472, and *In re Niagara Falls etc. R. Co.*, 108 N. Y. 375, 15 N. E. 429, in which last case it is said "the courts are not confined to, and it is not to be tested exclusively by the description of those objects and purposes as set forth in the articles of association, but evidence *aliunde*, showing the actual business proposed to be conducted, may be considered." So here, the right to maintain these proceedings would not be denied the city because in its petition it recited that since 1893 it had been furnishing "power purposes, public and private." It is not what the city has been doing, but what its purpose is in seeking to appropriate this land that we are concerned with. If its ultimate use of the power it now seeks is for both public and private purposes, then if those powers cannot be separated, they must both be denied.

We will now examine the evidence and see what use the city has made of its electrical power, as bearing in some measure upon what use it will put the additional power to which it now seeks. Under contract with a power company, the city now uses 9,000 horse power, and it is purposed by

the use of the power plant which is the object of these pro-
ceedings to generate 20,000 horse power.  The use of power
has increased in the past three years from 3,400 horse power
to 9,000, and from 5,228 lighting meters to 11,258; and
for the purpose of supplying its inhabitants with electricity
for lighting purposes, it has strung about one hundred miles
of additional wire in the last six months.  It also appears
that the same ratio of increase would necessitate 20,000 to
25,000 horse power in the next ten years.  From this show-
ing, it would seem that, with an average increase in popula-
tion and consequent demand for additional lighting facili-
ties, the city is justified in preparing for a plant that will
create 20,000 horse power.  It is evident that the growing
demands of the present city and the requirements of the
near future will necessitate the generation of 20,000 horse
power to supply the inhabitants of Tacoma with lights and
other public uses.  The city electrician in his testimony, re-
ferring to the use made by the city of its present power,
said: "We furnish current for lighting, and also for heating
devices, cooking and ironing and things like that; also for
motors;" and in response to a question seeking to elicit
evidence of use of power by manufacturing plants and fac-
tories, the same witness testified: "I am sure I cannot say all
the purposes; running small machines, such as lathes and
grinding machines."  He also testified that the city could
not enter into competition with power companies for factory
use, because it could not afford to make as cheap a rate, and
hence could not get the business if it desired to.  It was
also stated that these small users above referred to were com-
pelled to keep off the peak load.

It is manifest that, in its use of power, the city must pro-
vide for the maximum power that will be required on the
shortest day of the year.  This required use would be its
peak load, and would be the minimum horse power to be
generated by its contemplated plant, or purchased under its
present contracts.  This peak load would gradually lessen

until the longest day of the year, when it would be much less than its peak requirement; yet inasmuch as there is no known way whereby the city could store and save its power when not in use, it must provide, on the longest day of the year and at the time of least requirement, the same amount of power it must use on the shortest day of the year and at the time of greatest requirement. Neither will it require power for lights until the evening of the day; yet it must have as much power at high noon as on the darkest night. If, in the meantime, it permits a small mechanic to run his lathe or sharpen his tools, such a use being so insignificant and so small as compared with the necessities that must be supplied, no court would hold that such use was such a private use as to prevent the city from maintaining these proceedings. A private use incidentally included will not defeat the right to condemn for public use so long as the public use is maintained.

"There is no question but what, if a private use is combined with a public one in such a way that the two could not be separated, that the right of eminent domain may not be invoked to aid the joint enterprise. We mean by this, that the two purposes must together exist as main, or principal, ones; but where the private purpose is simply an incident, and the public use the principal, then the incident will not destroy or defeat the principal." *Lake Koen Nav. etc. Irr. Co. v. Klein, supra.*

The language of the court in *Slingerland v. Newark*, 54 N. J. L. 62, 23 Atl. 129, seems to us pertinent in view of the situation before us:

"It would, of course, be absurd for the city to construct water works adequate only for its present wants, and the prosecutor does not assert that the works now contemplated are unreasonably large in view of the city's prospective growth, or that more land is to be taken than is necessary for their construction and maintenance. Under these circumstances it is not apparent how the prosecutor can have any legal concern with the quantity of water drawn through the aqueduct, or with the use made of so much of it as the public does not need. But, at any rate, the mere fact that, as a natural

incident to the securing of public water supply, more water is obtained than is now requisite for public purposes, and that the city disposes of the surplus for an outside use, does not deprive the condemnation of its public character. The power to construct and maintain the works still rests on the municipal use, not on the disposition of the accidental excess;" citing *Spaulding v. Lowell*, 23 Pick. 71, and *State v. Eau Claire*, 40 Wis. 533.

The supreme court of the United States, while strictly adhering to the rule that private property may not be taken for private use, sees nothing objectionable in permitting the state of Wisconsin, which under legislative act reserved to itself the water power created by a dam over the Fox river, to dispose of some of its surplus water for private use, as there was no need of such surplus water running to waste and the state might thus reimburse itself for the expense of the improvement. *Kaukauna Water Power Co. v. Green Bay & M. Canal Co.*, 142 U. S. 254. In the note to *Wisconsin River Imp. Co. v. Pier* (137 Wis. 325, 118 N. W. 857), 21 L. R. A. (N. S.) 538, at page 543, it is said in speaking of this incidental private use:

"The principle that an incidental private use will not defeat the exercise of the power of eminent domain is also to be found stated in many cases not falling within the scope of this note for the reason that the incidental private use, so called, was merely the prospective enjoyment of the same character by a private individual, but in a greater degree than the general public and not the enjoyment of a use distinct from that which the public could share."

In the *Harris* case, *supra*, in which this court withheld the power of eminent domain, it was shown that the power was required to furnish lights to the cities of Olympia and Tumwater, to run electric cars between those two cities, and also to sell power to manufactories. Here there was a manifest combination of public and private use, and both uses were principal uses. In the case before us now, it is apparent from the evidence, which must be the controlling feature, that

the city's need of the power it seeks is a strictly municipal and public use, and that it.is not seeking, in its requirement of 20,000 horse power, more than it will in the near future be required for a purely public use. And if in the meantime, or during the time when it does not require its peak load for its public use, it permits such uses as the evidence shows it now does, such use is so insignificant and so purely incidental that it will not defeat the right to condemn for the public use.

It is next contended that, appellant being a public service corporation, its property cannot be taken. It is undoubtedly well established that property devoted to a public use may not be taken for other public use without legislative grant, either in. express terms or by necessary implication. The general question here involved was submitted to this court in *Samish River Boom Co. v. Union Boom Co.*, 32 Wash. 586, 73 Pac. 670, wherein it was held that the right to determine under what circumstances and to what extent the power of eminent domain might be exercised was vested exclusively in the legislature, enforced by the constitutional provision that "the exercise of the right of eminent domain shall never be so abridged or construed as to prevent the legislature from taking the property and franchises of incorporated companies and subjecting them to public use the same as the property of individuals." Const. art. 12, § 10. The rule was then laid down that property held by a corporation as a proprietor, and not actually devoted to a public use, could be taken by another corporation having the power of eminent domain.

Again, in *State ex rel. Skamania Boom Co. v. Superior Court*, 47 Wash. 166, 91 Pac. 637, the same question was presented, and it was held that, where there is a necessity· for subjecting land devoted to a public use to some other public service, it might be condemned; and "necessity" was defined by quoting Lewis on Eminent Domain, §276: "That there was a reasonable necessity for the taking where the

public interest would be better subserved thereby, or where the advantages to the condemnor will largely exceed the disadvantages to the condemnee."

It might be suggested in this connection that the appellant, though incorporated in 1905, has not been very active in carrying out its purposes. The lands it now owns it acquired by purchase. In March, 1907, it commenced a number of condemnation suits to acquire other lands required by its general scheme, but it does not appear to have pushed these suits to a determination, or to have taken any other steps toward subjecting the waters of the Nisqually river to its power purposes. These lands are not now, therefore, devoted to any public use, nor have we any assurance that they ever will be, except the intention and purpose of the company as expressed in various resolutions of its board of trustees. We do not, however, care to rest our decision of the point before us upon this ground. As applied to municipal corporations, there is a broader and more comprehensive ground, growing out of the necessities of like situation and based upon a theory of a greater public use and more general public benefit. In *In re City of Brooklyn*, 143 N. Y. 596, 38 N. E. 983, 26 L. R. A. 270, it appears that the legislature passed an act reciting that the public interest required the acquisition by the city of Brooklyn, for the public use, of the property and franchise of a water supply company, and authorized the city "to acquire the same for such use by condemnation." Upon attempting to do so, it was met by the objection that the act was unconstitutional in authorizing the condemnation of property already devoted to a public use, without designating any different or larger public use to which it was to be applied. The court found no force in the objection, and said:

"While the purpose of the water works company was public in its nature, it cannot be said to be strictly identical with the municipal purpose. A municipal corporation is a public and governmental agency. It holds property for the

general benefit, with a larger scope of use.  When acquired by the municipality of the city of Brooklyn, the appellant's property would become a part of a general system, under a single management, and conducted essentially as a public work.  If in order the better to subserve the public use the appropriation of private property is necessary, even though it be already devoted to a similar use, the right to make it is incident to the legislative power, and it is necessary for the general good that the right be conceded."

In *Brady v. Atlantic City*, 53 N. J. Eq. 440, 32 Atl. 271, the legislature enacted:

"That cities may take and convey from such source or sources as may be practicable, into and through said city, such quantity of pure and wholesome water as may be required . . . and to this end the said city is hereby authorized to . . . purchase of any water company water works within said city;"

and it was held that this conferred the right to condemn the plant and franchise of the water company for the benefit of the city; and the court adds that the right of eminent domain in such cases is not questioned. In *In re Mayor etc. of New York*, 135 N. Y. 253, 31 N. E. 1043, 31 Am. St. 825, an act empowering the city to acquire by eminent domain all wharf property within its limits was held sufficient to enable the city to condemn wharf property owned by a railroad and a gas company and actually occupied by them for public use.  Having in mind this more extended and beneficial public use employed by municipal corporations as a governmental agency, we will refer to our statute.  Its language as applied to the use here sought is:

"That any incorporated city . . . be, and is hereby, authorized . . . to construct, condemn and purchase, purchase, acquire, add to, maintain and operate works, plants and facilities for the purpose of furnishing such city or town and the inhabitants thereof and any other persons, with gas, electricity and other means of power and facilities for lighting, heating, fuel and power purposes." Laws 1909, p. 580, ch. 150, § 1 (Rem. & Bal. Code, § 8005).

It would seem that, in the employment of such language, it was the intention of the legislature to expressly grant the power of condemnation of property devoted to a public use. Otherwise there could be no meaning to the words "condemn and purchase," "works, plants and facilities." The legislature, having in mind, in many of our cities, works, plants and facilities were in use furnishing such cities with heat, power, water, and lights, sought to confer upon cities the right to acquire such plants by either purchase or condemnation. Certainly if it is not an express grant, it is at least a necessary implication. Otherwise the language could be given no force or effect whatever. The whole tenor of the act is a manifest intention to confer upon cities the right to acquire all existing public utilities, either by condemnation or purchase, or to construct their own plants for such purposes.

We will now consider several assignments or error at the trial. The court refused evidence on behalf of appellant that it was a public service corporation, and instructed the jury that it was not such a corporation. Such evidence could only be offered for two purposes: to enhance the value of the land, or to prevent condemnation on the theory of the property being held for a public use. The value of the land was to be determined by its use, situation, and adaptability. It was immaterial whether its ownership was in a public service corporation or an individual. Such fact could not add to or lessen its value; ownership is not a factor in determining valuation. The evidence shows that the court was extremely liberal in permitting evidence of value of the land and its use in connection with power purposes, and under its ruling appellant's witnesses testified to a valuation as high as $497,200. When we consider that this land was raw, wild land, it is apparent the witnesses in fixing such great values were taking every possible use and adaptability into consideration. Neither was it, in view of what we have said, reversible error to instruct the jury that appellant was not

a public service corporation. Whether it was or was not was irrelevant to any question submitted to them.

Error is also assigned in an instruction in which the jury were told, in fixing the values: "You should determine from your observations of the property sought and assisted by the testimony of witnesses who have testified as to the value of the same." This was not a correct statement of the law, and standing alone it might have been held error; but the court in other instructions gave the jury proper rules for determining the values, and said to them that their view of the premises was to enable them to better understand the testimony. Taken as a whole, the instructions upon this point fairly stated the proper rule.

Complaint is made of an instruction in which the court withdrew from the jury evidence given by appellant of the possible profits which might be derived from a power plant upon appellant's lands. Such instruction was proper. We do not consider that, in determining the value of land for condemnation purposes, evidence of possible profits of a business that might be carried on there is admissible for any purposes. Other errors are assigned, but they are disposed of in what has been said, and this opinion is now too long to permit of any separate discussion of them.

The judgment is affirmed.

MOUNT, PARKER, CROW, and CHADWICK, JJ., concur.

RUDKIN, C. J. (dissenting)—It seems to me the majority have found a simple solution of a difficult problem. As I read the act of March 17, 1909, Laws of 1909, page 580, it authorizes cities and towns to condemn plants and facilities for the purpose of furnishing such cities and towns and their inhabitants, *and any other persons*, with electricity for lighting, heating, fuel, *and power purposes, public and private.* If the act means what it says, it authorizes cities and towns to exercise the right of eminent domain and condemn property and plants to enable them to generate electricity to be

sold, distributed, and used for *private power purposes*, a right this court has repeatedly denied to other corporations. The majority apparently concede this, for they find it necessary to read the word "private" out of the statute. In other words, in order to satisfy one provision of the constitution, they violate another, by usurping powers vested in a different department of the government, viz., the power to make and amend laws. I find no fault with the incidental and subsidiary uses that may be made of electricity generated for public purposes, under the majority opinion, but this is begging the whole question. The private uses are not subsidiary or incidental. The city of Tacoma might sell and dispose of all electricity generated for what this court has heretofore denominated private purposes, and still keep within the provisions of the statute. The word "private" was used in this connection advisedly, for in the earlier part of the same section cities are authorized to operate water works for the purpose of furnishing such cities and the inhabitants thereof, *and any other persons*, with an ample supply of water *for all uses and purposes, public and private, including water power and other power derived therefrom*. In view of these several provisions, I find no justification for the claim that the private uses are merely incidental. If this is the proper construction of the statute—and in my opinion it admits of no other—the entire act is void, because it is left entirely optional with the city whether property acquired by condemnation shall be devoted to a public or a private use. *Attorney General v. Eau Claire*, 37 Wis. 400, 436; *Berrien Springs Water Power Co. v. Berrien Circuit Judge*, 133 Mich. 48, 94 N. W. 379, 103 Am. St. 438; *State ex rel. Harris v. Superior Court*, 42 Wash. 660, 85 Pac. 666, 5 L. R. A. (N. S.) 672.

The judgment should be reversed, with directions to dismiss the action.

FULLERTON, GOSE, and DUNBAR, JJ., concur with RUDKIN, C. J.